UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**LAWERENCE MCINTYRE,**

      **Plaintiff,**

v.                                          Case No:  6:13-cv-251-Orl-41KRS

**SHERIFF, SEMINOLE COUNTY
SHERIFF'S OFFICE and TIMOTHY
OWENS,**

      **Defendants.**
_____/

**ORDER**

THIS CAUSE is before the Court on cross-motions for summary judgment (Doc. Nos. 63, 64) filed on June 2, 2014. This cause is also before the Court on Plaintiff's and Defendants' Motions in Limine (Doc. Nos. 78, 79). As set forth herein, Plaintiff's Motion for Summary Judgment will be denied; Defendants' Motion for Summary Judgment will be granted; and the Motions in Limine will be denied as moot.

**I.**      **BACKGROUND**

Plaintiff filed a Complaint (Doc. 2) in State court on January 8, 2013, which Defendants removed to this Court on February 13, 2013 (Notice of Removal, Doc. 1). Plaintiff asserts claims against all Defendants for common law false arrest and false imprisonment (Counts I and II) and violation of his constitutional rights via 42 U.S.C. § 1983 (Counts V and VI). Plaintiff also asserts claims of intentional infliction of emotional distress ("IIED") (Count III) and battery (Count IV) against Defendant Timothy Owens, individually.

Plaintiff's claims stem from an incident that occurred on February 15, 2011, (Arrest Report, Doc. 64-16, at 1), in the Lincoln Heights neighborhood of Sanford, Florida, (Owens Aff., Doc. 64-

1, ¶ 2). At some point in the afternoon, Plaintiff arrived at his Grandmother's house, located at 1838 Coolidge Avenue, Sanford, Florida. (Mcintyre Dep., Doc. 62-1, at 8:1–11, 44:14–45:5). After spending time with his Grandmother, Plaintiff walked across the street to the home of Earl McKinnon where approximately seven individuals were gathered in the side-yard socializing and playing dominos. (*Id.* at 45:6–8, 49:8–20, 51:2–16, 54:1–3). These individuals included Plaintiff's cousins, Antonio Strickland and Phillip Hunt, and a friend named Raymond "Duke" Ashley. (*Id.* at 51:13–52:24; Strickland Dep., Doc. 71, at 3:21–25; Ashley Dep., Doc. 69, at 3:21–4:15, 24:3–8). Another neighbor, Clarence Ford, and his father were sitting on Mr. Ford's front porch located across the street from the McKinnon house and next to Plaintiff's Grandmother's house. (Ford Dep., Doc. 70, at 3:11–4:12, 6:19–7:7). Additionally, there was a group of people gathered for a funeral at a house adjacent to the McKinnon house. (Mcintyre Dep. at 56:6–18).

At this time, Timothy Owens ("Defendant Owens"), a Deputy Sheriff with the Seminole County Sheriff's Office, was on a routine patrol in the area. (Owens Dep., Doc. 66, at 4:7–13, 16:11–13). Defendant Owens was driving down a street adjacent to Plaintiff's location with his windows open when Defendant Owens observed the odor of burnt marijuana and turned on to Coolidge Avenue. (*Id.* at 16:14–17:25, 20:13–23; Arrest Report at 1). The first house Defendant Owens arrived at was the McKinnon house, where he saw Plaintiff and the other individuals gathered. (Owens Dep. at 20:24–21:11).

Defendant Owens did not observe anyone smoking at the time, but he continued to smell burnt marijuana. (*Id.* at 21:6–13). In response to the odor of burnt marijuana, Defendant Owens stopped his car in front of or near the driveway of the McKinnon house. (*Id.* at 21:14–22:9; Mcintyre Dep. at 63:19–64:5). Defendant Owens then approached the individuals with his hand on his holster, instructed everyone remain still then asked the group, "where's the weed?"

Defendant Owens informed the group that he could smell marijuana. (Mcintyre Dep. at 64:8–64:24; Owens Dep. at 24:3–14; Ashley Dep. at 9:10–20; Strickland Dep. at 12:12–21). Defendant Owens testified that as he approached the group, "the odor [of burnt marijuana] became stronger" and that "it was apparent that the smell of marijuana was coming from [the vicinity of the group]." (Owens Dep. at 24:12–23).

After Defendant Owens instructed the group to stay where they were, at least one individual asked Defendant Owens if they were under arrest, to which Defendant Owens made no response.[1] (Mcintyre Dep. at 66:1–67:12). Thereafter, several of the individuals stood, (Strickland Dep. at 13:6–19; Owens Dep. at 38:19–39:6), and two—Mr. Ashley and Mr. Hunt—walked away leaving the McKinnon property. Mr. Hunt first walked into the yard at the McKinnon property and retrieved his child; he then walked across the street to Plaintiff's Grandmother's house. (Mcintyre Dep. at 67:17–25). Mr. Ashley walked across the street towards Mr. Ford's house. (Ashley Dep. at 10:11–11:7). It is unclear whether Defendant Owens said anything to Mr. Ashley or Mr. Hunt when they were walking away, but he did not attempt to stop them from leaving. (Mcintyre Dep. at 70:23–25; Ashley Dep. at 27:1–24; Owens Dep. at 28:19–31:7).

Around the same time, Plaintiff assisted another individual, Geraud Riggins, in retrieving his son from the yard. Mr. Riggins and his son also left the McKinnon property and walked across the street to Plaintiff's Grandmother's house. (Mcintyre Dep. at 74:12–18). Plaintiff soon followed and began walking in the same direction. (*Id.* at 74:17–25; Owens Dep. at 40:22–41:2). As Plaintiff walked away, Defendant Owens called after him, ordering him "not to leave, to come back, to stay where he was." (Owens Dep. at 42:1–4; Mcintyre Dep. at 75:7–21, 78:11–17). Plaintiff did not

---

[1] Defendant Owens does not recall being asked this question but does not deny that it occurred. (Owens Dep. at 39:24–40:5, 45:7–11).

comply with Defendant Owens's order and instead started moving away at a faster pace. (Mcintyre Dep. at 80:14–81:4). It is disputed whether Plaintiff began running. (*See id.* at 76:1–6 (stating that he was walking "kind of fast" but "definitely not jogging"); Owens Dep. at 41:9–11 ("[Plaintiff] walked along the side of the house . . . [a]nd then once he made the corner, he went diagonally, [and] began running."); Strickland Dep. at 18:8–12 ("[Plaintiff] ran a little bit")). When Plaintiff failed to respond to Defendant Owens's commands, Defendant Owens began pursuing Plaintiff. (Mcintyre Dep. at 78:11–17; Owens Dep. at 50:8–13; Strickland Dep. at 17:16–18:7).

When Defendant Owens first caught up with Plaintiff, Defendant Owens grabbed Plaintiff's arm. (Mcintyre Dep. at 81:7–13). Plaintiff pulled away from Defendant Owens, who grabbed Plaintiff a second time. (*Id.* at 81:14–82:5). Exactly what ensued thereafter is in dispute; the result, however, was that Plaintiff ended up on the ground with a broken left leg. There is conflicting evidence on the record as to whether Plaintiff fell or whether he was brought down by Defendant Owens. (*Id.* at 83:2–86:19; Owens Dep. at 51:5–52:8). In either case, while Plaintiff was on the ground, Defendant Owens physically restrained Plaintiff by placing his knee on or near the back of Plaintiff's left leg and handcuffing Plaintiff. (Owens Dep. at 61:19–20; Mcintyre Dep. at 86:20–87:3; Strickland Dep. at 18:23–19:2, 22:1–13; Ashley Dep. at 28:9–29:12). At this point, Plaintiff was yelling that his leg was broken. In response to Plaintiff's screams, Mr. Hunt and Mr. Strickland, who were approximately fifteen feet away, began yelling at Defendant Owens to get off Plaintiff, (Strickland Dep. at 18:23–19:20), and that he had no right to do what he was doing, (Owens Dep. at 67:1–25).[2] From their front porch, Mr. Ford and his father also began yelling, "[G]et up off the boy. We don't like no polices." (Ford Dep. at 11:15–19). Due to the commotion,

---

[2] Defendant Owens also testified that Mr. Hunt and Mr. Strickland were yelling obscenities. (Owens Dep. at 67:7–11).

more neighbors came over and a group began to form around the scene. (*Id.* at 11:23–12:4; Ashley Dep. at 14:21–15:3).

Shortly thereafter, the paramedics and additional Seminole County deputies arrived. (Owens Dep. at 64:1–65:4). Once Plaintiff was in custody, Defendant Owens ran Plaintiff's driver's license number and discovered a warrant identification number for a child support writ of bodily attachment that had been issued for Plaintiff. (Owens Aff. ¶ 5; Sept. 3, 2010 Writ of Bodily Attachment, Doc. 64-7, at 16[3]). After being transported to Central Florida Regional Hospital, X-rays revealed two fractures in Plaintiff's leg, (Offense Report, Doc. 62-1, at 167[4]), and due to the severity of the fractures, Plaintiff underwent surgery, (Mcintyre Dep. at 99:23–100:6; Baker Dep., Doc. 73-1, at 13:16–14:1). Plaintiff remained in the hospital for five days and was in custody during that time; however, Plaintiff did not spend any time in jail in relation to the incident.

## II.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). Summary judgment is mandated "against a party who

---

[3] Multiple documents are filed at Docket Entry 64-7, therefore, the pinpoint citation is to the electronic page number.

[4] The Offense Report is attached to Plaintiff's Deposition and filed therewith at Docket Entry 62-1. However, it is not labeled as an exhibit, and therefore, for ease of reference, pinpoint citations refer to the electronic page number.

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251–52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III. ANALYSIS

Central to all of Plaintiff's claims is the issue of whether Defendant Owens was acting lawfully when he made the initial stop of Plaintiff based on the odor of burnt marijuana. Plaintiff asserts that this investigatory stop was not based on reasonable suspicion and therefore illegal. Based on his conclusion that the stop was illegal, Plaintiff concludes that there was no probable cause to arrest him for resisting an officer without violence and, therefore, any use of force by Defendant Owens was unreasonable.

Even if the initial stop and arrest were lawful, however, Plaintiff asserts that the amount of force used by Defendant Owens was still excessive under the circumstances. This alleged

excessive use of force, according to Plaintiff, not only provides a basis for his § 1983 excessive force claim, but also his battery and IIED claims.

Contrary to Plaintiff's assertions, the initial stop was lawful and Plaintiff's arrest was supported by probable cause. Additionally, under the totality of the circumstances, Defendant Owens's use of force was not excessive. Based on these conclusions, Plaintiff's battery and IIED claims fail and there is no basis on which to hold the Seminole County Sheriff's office liable.

### A.     Initial Stop

Plaintiff asserts that the initial stop violated both the United States and Florida Constitutions. "The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). Article I, section 12 of the Florida Constitution mirrors the Fourth Amendment of the United States Constitution and provides that it "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."[5]

"The [United States] Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply." *Perkins*, 348 F.3d at 969. These categories include: "(1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny; (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth

---

[5] Article I, section 12 of the Florida Constitution is the basis of "the Florida Stop and Frisk Law," which the Florida Supreme Court has explained "was not intended to, and does not, impose any higher standard than that of the Fourth Amendment." *State v. Dilyerd*, 467 So. 2d 301, 303 (Fla. 1985) (quotation omitted).

Amendment scrutiny." *Id.* (citations omitted). The initial stop falls into the second category, an investigative stop.

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny, "the police may stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is lacking." *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010) (quotation omitted). In order to conduct this type of investigative stop, "the officers must have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *Id.* (quotation omitted). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quotations omitted). This analysis "takes into account the totality of the circumstances—the whole picture." *Id.* (quotation omitted).

It is clear under Eleventh Circuit precedent that "[t]he smell of marijuana alone may provide a basis for reasonable suspicion for further investigation of possible criminal conduct." *White*, 593 F.3d at 1203; *see also United States v. Hunter*, 373 F. A'ppx 973, 976 (11th Cir. 2010) ("The recognizable smell of marijuana is sufficient to establish reasonable suspicion."). Here, Defendant Owens testified that he initially stopped because he observed the odor of burnt marijuana and that, as he approached the group of individuals at the McKinnon house, the smell grew stronger. Plaintiff has offered no evidence to rebut Defendant Owens's testimony.

Instead, Plaintiff cites two Florida cases for the proposition that the smell of marijuana is insufficient to create reasonable suspicion when emanating from a group, if the officers do not have any further particularized suspicion as to each of the individuals in the group. Contrary to

Plaintiff's assertions, the majority of Florida cases that address this issue agree with the Eleventh Circuit's analysis that the smell of burnt marijuana is sufficient to establish reasonable suspicion.[6] For example, in *D.H. v. State*, 121 So. 3d 76 (Fla. 3d DCA 2013), the Third District Court of Appeal determined that a law enforcement officer had reasonable suspicion for an investigative stop based on the odor of burnt marijuana, even though he did not see any marijuana. *Id.* at 81. Additionally, the Second District Court of Appeal in *State v. Hernandez*, 706 So. 2d 66 (Fla. 2d DCA 1998), determined that "a strong odor of marijuana emanating from [a] cluster of people," which became stronger when the officers approached the group, provided the officers probable cause "to search each person who was present." *Id.* at 66–67. Although *Hernandez* has been abrogated in so far as such circumstances are not enough for probable cause, it still indicates that the situation created reasonable suspicion.

Additionally, the two cases cited by Plaintiff, *Robinson v. State*, 976 So. 2d 1229 (Fla. 2d DCA 2008) and *A.T. v. State*, 93 So. 3d 1159 (Fla. 4th DCA 2012), are inapposite. In *Robinson*, while the court did determine that the smell of burnt marijuana emanating from a group was, without more, insufficient to support *probable cause* for the officer to conduct a warrantless search, the decision did not address whether the facts supported reasonable suspicion. 976 So. 2d at 1232–33. The *Robinson* court concluded that, "The fact that Robinson was standing with a group of men surrounded by the odor of burned marijuana was insufficient to supply more than a 'mere

---

[6] Due to the fact that the Florida Constitution specifically provides that the provision at issue "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court," Fla. Const. art. 1 § 12, Eleventh Circuit decisions applying U.S. Supreme Court precedent are persuasive in determining whether reasonable suspicion existed under Florida law. *See Perez v. State*, 620 So. 2d 1256, 1258 (Fla. 1993) ("By reason of the 1982 amendment to article I, section 12 of the Florida Constitution, [the Florida Supreme Court] is bound to follow the United States Supreme Court's interpretations of the Fourth Amendment and to provide no greater protection than those interpretations.").

suspicion' that Robinson was in possession of marijuana." *Id.* at 1233. It is questionable whether this statement was made in reference to the existence of reasonable suspicion, but to the extent that it was, the statement is dicta. The existence of reasonable suspicion was not at issue in *Robinson*, nor was it discussed in the opinion.

Nevertheless, the court in *A.T.* relied solely on dicta from *Robinson* in holding that similar circumstances did not support reasonable suspicion. 93 So. 3d at 1160–61. Furthermore, Plaintiff's arguments and the *A.T.* opinion conflate the requirements of probable cause and those of reasonable suspicion. *Robinson* and its limited Frankensteinian progeny serve as object lessons as to the effects of unnecessary excursions into matters not before the court. These decisions, and specifically *A.T.*'s sweeping expansion of ambiguous dicta, contradict both Florida and United States Supreme Court precedent.[7]

As the foregoing demonstrates, Defendant Owens had reasonable suspicion to conduct an investigative stop when he smelled the odor of burnt marijuana emanating from the vicinity of Plaintiff and the other individuals. Moreover, suspicion certainly grew as the odor became stronger when Defendant Owens approached. Thus, the initial stop was lawful and Plaintiff was not free to walk away.

### B. False Arrest Claims

Plaintiff asserts claims for false arrest under Florida common law and unconstitutional arrest pursuant to § 1983. These actions are opposite sides of the same coin. "A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim. The

---

[7] Notably, Plaintiff made the same argument, citing the same caselaw, before the State court in his related criminal case pursuant to a motion to suppress, and the State court determined that Defendant Owens had reasonable suspicion to conduct an investigative stop of Plaintiff. (Mot. to Suppress Hr'g Tr., Doc. 64-28, at 31:4–32:21).

existence of probable cause at the time of arrest, however, constitutes an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (citation omitted). Plaintiff has "the burden of demonstrating the absence of probable cause in order to succeed in [his] § 1983 claim." *Rankin v. Evans* 133 F.3d 1425, 1436 (11th Cir. 1998).

On the other hand, under Florida law, "[f]alse arrest is defined as the unlawful restraint of a person against that person's will," and "probable cause is an affirmative defense to be proven by the defendant."[8] *Willingham v. City of Orlando*, 929 So. 2d 43, 48 (Fla. 5th DCA 2006). In other words, "The only difference in the probable cause analysis applicable to the state and federal claims at issue here is which party carried the burden of proving whether probable cause existed." *Rankin*, 133 F.3d at 1436. Under either analysis, the Court concludes that probable cause to arrest Plaintiff existed.

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (quotation omitted). "Whether an officer possesses probable cause . . . depends on the elements of the alleged crime and the operative fact pattern." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010). In determining whether probable cause existed, courts must look at the "totality of the circumstances." *Poulakis v. Rogers*, 341 F. A'ppx 523, 526 (11th Cir. 2009) (citing *Rankin*, 133 F.3d at 1435).

---

[8] In Plaintiff's Complaint, he asserts claims for "False Arrest/False Imprisonment." (Compl. at 4, 5). While the Court recognizes that, in some instances, these causes of action are distinguishable, Florida caselaw "treat[s] false imprisonment and false arrest as essentially the same tort when the issue involves an arrest and detention by a law enforcement officer." *Willingham*, 929 So. 2d at 49-50. In such a situation, probable cause is also an affirmative defense to false Imprisonment. *Miller v. City of Jacksonville*, 603 So. 2d 1310, 1312 (Fla. 1st DCA 1992).

Plaintiff was initially arrested for resisting an officer without violence, in violation of Section 843.02 of the Florida Statutes. The elements of resisting an officer without violence are: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the actions of the defendant obstructed, resisted, or opposed the officer in the performance of that legal duty." *S.L. v. State*, 96 So. 3d 1080, 1084–85 (Fla. 3d DCA 2012). As discussed previously, Defendant Owens was engaged in the lawful execution of a legal duty when he conducted the investigative stop of Plaintiff and when he ordered Plaintiff to stay where he was pursuant to that stop. Furthermore, by Plaintiff's own admission, he resisted and opposed Defendant Owens's execution of the stop by walking away, ignoring Defendant Owens's orders, and pulling away from Defendant Owens. Therefore, Defendant Owens had probable cause to arrest Plaintiff for resisting an officer without violence, and Defendants are entitled to summary judgment on both the State law and § 1983 false arrest claims.

### C.   Section 1983 Excessive Force Claims

Plaintiff maintains that the amount of force used by Defendant Owens, even pursuant to a lawful arrest, was excessive. "[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation omitted).

"In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances

and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012) (quotation omitted). When determining the perspective of a "reasonable officer on the scene," courts must be careful not to use the "the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

"Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive." *Jackson v. Sauls*, 206 F.3d 1156, 1170 (11th Cir. 2000) (quotation omitted). "The hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test, and the test requires weighing of all the circumstances." *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 383 (2007) (noting that in order to determine whether excessive force was used "we must . . . slosh our way through the factbound morass of 'reasonableness.'"). Nevertheless, the Eleventh Circuit distilled three guiding factors from *Graham* to assist in balancing the analysis: "(i) the severity of the crime at issue, (ii) whether the suspect poses an immediate threat to the safety of the officers or others, and (iii) whether he is actively resisting arrest or attempting to evade arrest by flight." *Steen v. City of Pensacola*, 809 F. Supp. 2d 1342, 1349–50 (N.D. Fla. 2011) (citing *Brown*, 608 F.3d at 738).

In this case, even considering the facts in the light most favorable to the Plaintiff, Defendant Owens did not use excessive force. Plaintiff's excessive force arguments are based on his conclusion that his arrest was unlawful, and therefore, any force used was also unlawful. Although the severity of Plaintiff's purported crimes were relatively minor, he was actively resisting arrest

and attempting to flee the scene. Furthermore, while it does not appear that Plaintiff himself physically threatened Defendant Owens, a reasonable officer could have concluded that Plaintiff's actions created a situation that posed an immediate threat to Defendant Owens's safety. *See Steen*, 809 F. Supp. 2d at 1352 (explaining that a threat created by a plaintiff's flight can support the use of more substantial force). Defendant Owens was the only law enforcement officer surrounded by eight suspects and multiple onlookers who were hostile to police presence. Losing control of such a situation could have posed a danger to Defendant Owens. Plaintiff's actions in ignoring Defendant Owens's commands further undermined Defendant Owens's authority and control. Accordingly, even if Defendant Owens tackled Plaintiff or swept Plaintiff's legs out from under him in order to effect an arrest, his use of force was not excessive. *See Griffin v. Runyon*, 213 F. A'ppx 938, 939 (11th Cir. 2007) (concluding that the plaintiff's actions in "ignor[ing] the deputy's commands to halt and attempt[ing] to flee," made the deputy's use of pepper spray reasonable even though the severity of the crime at issue, criminal trespass, was relatively minor).

Accordingly, even considering the facts in the light most favorable to Plaintiff, Defendant Owens did not use excessive force in subduing Plaintiff. Therefore, Defendants are entitled to summary judgment on those claims.

  **D. Battery**

In light of the Court's previous determinations, Plaintiff's battery claim cannot stand. In Florida, "[a] battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997). "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). "Traditionally,

a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." *Id.*; *see also Epstein v. Toys-R-Us Del., Inc.*, 277 F. Supp. 2d 1266, 1275 (S.D. Fla. 2003) ("Pursuant to Florida law, contact incident to [a lawful] arrest cannot form the basis of a claim for battery."); *Behm v. Campbell*, 925 So. 2d 1070, 1073 (Fla. 5th DCA 2006) (explaining that plaintiff's battery claim failed because it was based on "acts that are simply part of the arrest process").

As discussed previously, Defendant did not use excessive force during the lawful arrest of Plaintiff. Accordingly, Plaintiff's battery claim fails and Defendant Owens is entitled to summary judgment on that claim.

### E.     Intentional Infliction of Emotional Distress

Similarly, because Defendant Owens used reasonable force in executing lawful actions, Plaintiff's IIED claim fails. Under Florida law, "to state a cause of action for [IIED], the plaintiff must prove that the wrongdoer's conduct was intentional or reckless; the conduct was outrageous; the conduct caused emotional distress; and the emotional distress was severe." *Horizons Rehab., Inc. v. Health Care & Ret. Corp.*, 810 So. 2d 958, 964 (Fla. 5th DCA 2002). Conduct satisfies the "outrageous" requirement only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985) (quotation omitted). "Whether the conduct is outrageous enough to rise to the level required by the tort may be decided as a question of law when the facts of a case can under no conceivable interpretation support the tort." *Vance v. S. Bell. Tel. & Tel. Co.*, 983 F.2d 1573, 1581 (11th Cir. 1993) (quoting *Williams v. City of Minneola*, 575 So. 2d 683, 692 (Fla. 5th DCA 1991)).

As discussed repeatedly, Defendant Owens was acting lawfully and without excessive force when he subdued and arrested Plaintiff. Although Plaintiff does not clearly articulate the

basis for his IIED claim, presumably it is based on Defendant Owens's purported tackling and arrest of Plaintiff. However, these actions do not amount to conduct "so outrageous in character" as to support a claim for IIED. *See Davis v. City of Leesburg*, No. 5:12–cv–609–Oc–10PRL, 2014 WL 4926143, at *27 (M.D. Fla. Sept. 30, 2014) ("Summary judgment shall be granted as to [the plaintiff's IIED] claims because under Florida law, these law enforcement officers are entitled to use reasonable force to carry out a lawful arrest without opening themselves to individual tort liability."); *Jessup v. Miami-Dade Cnty.*, No. 08-21571-CIV, 2010 WL 883684, at *10 (S.D. Fla. Mar. 10, 2010), *rev'd on other grounds*, 440 F. A'ppx 689 (11th Cir. 2011) ("[T]he record indicates that [the Defendant law enforcement officer] did not abuse his power, but, under the totality of the circumstances, lawfully conducted an investigatory stop, made an arrest with probable cause, and effected the arrest with reasonable force. As a result, none of his conduct was 'outrageous.'"); *Artubel v. Colonial Bank Grp., Inc.*, No. 8:08-cv-179-T-23MAP, 2008 WL 3411785, at *11 (M.D. Fla. Aug. 8, 2008) (holding that the plaintiff's allegations that she was injured when a law enforcement officer handcuffed her too tightly failed to state a claim for IIED because "the complaint allege[d] no extreme abuse of [the officer's] position," or other actions sufficient to meet the "outrageous conduct" requirement).

## IV. CONCLUSION

As the foregoing demonstrates, the initial stop conducted by Defendant Owens was supported by reasonable suspicion. Therefore, that stop was lawful, and Plaintiff was not free to walk away. Accordingly, Defendant Owens had probable cause to arrest Plaintiff for resisting an officer without violence when Plaintiff walked away, ignored Defendant Owens's commands to stop, began walking faster and pulled away from Defendant Owens. Moreover, given the totality of the circumstances, the force used by Defendant Owens in subduing and arresting Plaintiff was

reasonable. Based on these conclusions, Plaintiff's battery and IIED claims also fail, and there is no basis on which to find Defendant Seminole County Sheriff's Office liable.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment (Doc. 63) is **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. 64) is **GRANTED**.

3. Plaintiff's and Defendants' Motions in Limine (Doc. Nos. 78, 79) are **DENIED as moot**.

4. The Clerk is directed to enter judgment in favor of Defendants, providing that Plaintiff shall take nothing on any of his claims against Defendants. Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida on October 23, 2014.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record